## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM T. MCCANN,<br>**Plaintiff,**<br><br>v.<br><br>SCHOOL DISTRICT OF PHILADELPHIA,<br>CHARTER SCHOOLS OFFICE OF THE<br>SCHOOL DISTRICT OF PHILADELPHIA,<br>JOANNA BEAVER, STEFANIE FERRIOLA,<br>CRAIG JOHNSON, JR., AND OFFICE OF<br>SCHOOL SAFETY OF THE SCHOOL<br>DISTRICT OF PHILADELPHIA,<br>**Defendants.** | CIVIL ACTION<br><br><br>NO.  24CV6679 |

## MEMORANDUM OPINION

*Pro se* Plaintiff William T. McCann ("McCann") has sued the School District of Philadelphia ("the SDP" or "the District"); Principal Joanne Beaver ("Beaver") of the Girard Academic Music Program ("GAMP"); Stephanie Ferriola ("Ferriola"), a special education teacher at GAMP; and then-Interim Chief of School Safety Craig Johnson Jr. ("Johnson") (together "Defendants").[1]

McCann's Complaint alleges: (1) unlawful discrimination and failure to accommodate under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*;[2] (2) violation of the Health Insurance Portability and Accountability Act (HIPAA), 45 C.F.R. §

---

[1] McCann has also named in the caption of his Complaint the Philadelphia School District's Office of School Safety; and its Charter School Office.  But neither is a proper defendant here.  Pennsylvania Rule of Civil Procedure 76, read in conjunction with Rule 2102(b), provides that only certain political subdivisions may be sued: counties, cities, boroughs, incorporated towns, townships, *school districts*, vocational *school districts*, county institution district or municipal or other local authority.  Pa. R. Civ. P. 2102(b) (stating that only the state and political subdivisions may be sued) and 76 (defining political subdivisions) (emphasis added).  The offices of a school district are not such entities.  Thus, they shall be dismissed from this case.

[2] McCann's Complaint does not specify under which provision of the ADA he brings this claim.  However, Defendants frame their arguments as if it is brought under Title II, and McCann's Opposition does not contest that interpretation.

160.101 *et seq.*; (3) retaliation under the Pennsylvania Whistleblower Law, 42 Pa. C.S. § 1421 *et seq.*; (4) violation of the Pennsylvania Sunshine Act, 65 Pa. C.S. § 701 *et seq.*; (5) violation of the Pennsylvania Right to Know Law (RTKL), 65 Pa. C.S. § 67.101 *et seq.*; (6) Defamation; and, (7) First Amendment retaliation, under 42 U.S.C. § 1983.  All claims are brought against all Defendants.

Defendants have filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on all Plaintiff's claims.  For the reasons discussed below, the Motion will be granted in part, and denied in part.

## I.   PRELIMINARY MATTERS

Before proceeding to the facts of this case, some housekeeping is in order.

### A.  Documents Not Produced in Discovery

There are some documents that McCann has presented to the Court which Defendants argue should not be considered because they were not produced by him in response to their discovery requests.  These are a Philadelphia Police Incident Report and Incident History Details sheets, all dated October 16, 2024; a photocopy of an opened manila envelope with "Bill McCann Private & Confidential" written on it; and, finally, four scanned pages from a legal pad with various handwritten notes.  Because these documents were not included in the Parties' Joint Appendix, and were requested, but not produced, in discovery, they "are not part of the record[,]" and they will not be considered by the Court in deciding this Motion.  *See* Fed. R. Civ. P. 37(c) (if "a party fails to provide information . . . as required by [discovery rules], the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.")

2

### B. McCann's Affidavit

McCann includes his own affidavit as part of his Response to Defendants' Statement of Undisputed Material Facts. Consisting of 365 paragraphs, the affidavit discusses the facts McCann offers in support of his claims. Defendants maintain that the Court should not take his affidavit into consideration. While, "[a]s a general proposition, conclusory, self-serving statements made by affidavit are insufficient to withstand a motion for summary judgment[,]" *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990), if not conclusory, they may be considered in certain circumstances when an affiant sets forth specific facts that reveal a genuine issue of material fact. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002). Here, McCann's affidavit contains specific facts allegedly showing SDP's retaliatory intent (*see, e.g.* Paragraphs 140-56, 162, 180-82, 200-02, 230-37), the alleged statements informing his defamation claim (*see, e.g.* Paragraphs 24-33, 129-33), those circumstances allegedly indicating SDP discriminated against him based on his mental health (*see, e.g.* Paragraphs 17-20, 138-39, 158, 197-98, 208), among other topics. But Defendants have not identified any particular statement in McCann's affidavit as being problematically conclusory. Without a cogent argument as to why a particular statement in the affidavit should be ignored, the Court is not in a position to evaluate Defendants' position. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system . . . we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and [they are] responsible for advancing the facts and arguments entitling them to relief."); *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . .

will be deemed waived.")

### C.  McCann's Newly Asserted Claims

Next: in his response to Defendants' Motion, McCann discussed claims that are not found in his Complaint.  Specifically, he now asserts a new, unspecified "*Monell*" claim against the Charter School Office and Office of School Safety only (which cannot survive, as discussed *supra*, in any event given that neither office is a municipal entity).  But even if stated against a proper entity, that claim, as well as his newly referenced claims of a right to privacy in medical information under 42 U.S.C. § 1983, a right to privacy under the Fourteenth Amendment, and a Section 504 claim under the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* are not properly before this Court because a plaintiff is not permitted to assert new claims for the first time in response to a motion for summary judgment.  *See, e.g.*, *Scott v. Calpin*, 527 F. App'x 123, 126 n.4 (3d Cir. 2013) (affirming district court's refusal to consider claims raised in Scott's opposition to summary judgment).

### D.  Plaintiff's Theory of Defamation

The Defendants also argue that because McCann's Complaint did not identify the nature of his defamation claim—but only does so now—this Court should not consider this "new" theory of defamation *per se*.  There, Defendants' argument has no traction.  In his response to Defendants' Motion, McCann clarified that he is making a claim for defamation *per se*.  This is simply putting a fine point on his already pleaded defamation claim, which he is entitled to do. *See In re Lipitor Antitrust Litig.*, 855 F.3d 126, 144-45 (3d Cir. 2017) ("[R]egardless of how a complaint labels its claims . . . courts are to look to . . . its allegations as a whole to identify the plaintiff's claims and any theories undergirding those claims."); *accord Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 350 (3d Cir. 2005) (examining defamation *per se* as one

theory of liability nested within a defamation claim).

## II.    FACTUAL BACKGROUND

McCann is a former employee of the SDP, having served as a teacher, assistant principal, and other roles over his 25-year career.  He lives with bipolar disorder, and so medically retired under disability in fall 2020.  But sometime before October 2024, he decided he wanted to get back into the field of education and drafted applications to create three charter schools in Philadelphia: the GAMP Charter School, the GAMP Charter Elementary School at Stephen Girard, and the Philadelphia Charter High School for Real Estate and Building Trades.

**October 14th, 2024**: McCann visited the current GAMP facility, seeking institution-specific information for his charter applications.  In accordance with the school's entrance protocols, he rang the doorbell, was buzzed in through the locked front door, signed in at the security desk, and went to the main office.  Once in the office, the parties disagree as to whether he "requested" or "demanded" to speak with Principal Beaver.  Regardless, no meeting was held, and he was told he needed to email Beaver in order to arrange an appointment.

McCann then left GAMP, traveling to SDP's Central Offices.  He told the front desk which offices he was visiting, duly signed in, and was issued a visitor's pass.  A school safety officer offered to guide him around the building and eventually helped him expedite processing of an FBI Background Check.  McCann then proceeded to several of SDP's sub-offices including: the Office of Talent Acquisition (where he inquired about Child Abuse Clearance procedures and application deadlines); Charter Schools Office (where he asked Senior Project Manager Cameron Voss various questions for roughly ten minutes); the Office of the Director of Arts and Music (where Director Frank Machos allegedly instructed McCann to avoid email in seeking information from Beaver); and, the Office of Family & Community Engagement (where

he met with a representative, Victoria Trower, and submitted a letter of intent for one of his charter school applications).  McCann alleges that he did not have appointments for any of these meetings, but was not told to leave or otherwise hindered during his visit.

Following this trip through Central Offices, McCann then returned to GAMP sometime between 2:30-3:00pm.  He once again entered the school via standard protocol, and donated a small pumpkin to the main office's seasonal décor.  When he requested to meet with Beaver, he was provided with Beaver's email address and told again that she was unavailable and he needed to make an appointment.

He then exited GAMP and began to "observe dismissal."  He noticed several alleged "safety concerns, including vehicles parked illegally . . . and a school bus parked directly adjacent to a stop sign, blocking the view of pedestrians at the intersection of 22nd and Ritner Street."  Although he was not a crossing guard, nor dressed like one, he nevertheless "assisted parents, students, and drivers" at the intersection, at one point, he says, "prevent[ing]" a young girl from being struck by a car.  After dismissal came to an end, he returned to SDP Central Offices for a scheduled conference with the Charter School Office.

**October 15th, 2024**: He returned to Central Offices, this time to "obtain assistance with the charter school application process."  He did not have any pre-scheduled appointments during this visit, but was not told to leave and he encountered no difficulties during his meetings.

He then went over to GAMP, again seeking to meet with Beaver, hoping, he says, to both acquire information about the school for his charter applications, and raise his safety concerns about the prior day's dismissal procedures.  He again rang the doorbell, was buzzed in, signed in at the security desk, and proceeded to the main office where he sought an audience with Beaver. He was again informed that he needed to schedule an appointment via email. He then went

outside to again "assist" with dismissal by "ensur[ing] safe crossings" outside the school.

Later that afternoon, he returned to Central Offices for a prescheduled 3:45pm conference call at the Family & Community Engagement office. While there, he also submitted letters of intent for two of his charter school applications, the GAMP Charter School and GAMP Charter Elementary.

**October 16th, 2024:** On the morning of October 16, McCann once again returned to GAMP, but was not allowed to enter the building. A school safety officer told him that he "could not enter GAMP unless he emailed Principal Beaver stating his business." The officer also told McCann that, by Beaver's direct order, he was not allowed into GAMP because he had been "harassing the principal for days." When McCann refused to leave, Philadelphia Police were called and McCann was issued a warning for trespassing.

McCann then headed to Central Offices once again, this time intent on filing a complaint against Beaver. At the Office of School Safety, McCann explained the events of that morning to Robert Whitfield, then "Project Manager for the Office of School Safety."[3] He then moved on to something else: working to acquire "a stop sign for GAMP." Starting at SDP's Family & Community Engagement office, his quest took him to City Hall, and eventually the Philadelphia Streets Department, where he acquired a handheld stop sign and a safety vest for donation to GAMP.

Armed with this equipment, he returned to GAMP sometime that afternoon. This visit is the subject of great disagreement between the Parties, as the Defendants allege McCann was "impersonating" a crossing guard, while McCann insists he was only present to donate the equipment in light of GAMP's alleged safety issues. Regardless, when he rang the doorbell, he

---

[3] Erroneously misspelled as "Winfield" in certain filings.

was told he was not allowed in the building.  He waited on a nearby street corner until a Philadelphia Police car arrived.  Lieutenant Campbell of the 1st Police District took a statement from him, then reportedly spoke with several District officials, including Beaver and Whitfield. He then returned to McCann to question him about his "mental health status."  Ultimately, McCann was allowed to leave without citation or arrest.  But that afternoon, GAMP sent out a message via an automated phone call and through its online education platform to parents and other parties reading:

> This letter is to inform you of an incident that occurred at our school today.  This morning, an uninvited visitor was on school grounds during 5th and 6th grade recess.  Staff quickly brought students in the yard back into the building, and a lock-in was conducted.  The Philadelphia Police Department (PPD) was immediately notified and arrived at the school.  Once it was determined that the school was not under any imminent threat, our schedule was resumed and the lockdown was lifted.  PPD will be onsite for dismissal out of an abundance of caution.

Sometime that same afternoon or evening, McCann checked himself in to Thomas Jefferson University Hospital for a mental health evaluation.  He was cleared and discharged the same day.

**October 17th, 2024:** McCann returned, accompanied by his wife, Jillian Macomber, to the Central Offices.  They did not have an appointment but they headed to the Family & Community Engagement office, intending to file complaints.  McCann helped Macomber draft her complaint, before turning to his own, but could not finish his complaint before he had to leave for a pre-existing appointment.  That evening, McCann received a call from the Family & Community Engagement office alerting him that he had left some paperwork in the office, and that he could retrieve it the following day.

**October 18th, 2024:** The next day, he returned to Central Offices to retrieve his documents and finish his complaint.  McCann duly signed in, noting that he would be visiting the

Family & Community Engagement office and Charter Schools Office.  He received his misplaced papers, which included his hospital discharge forms, in a sealed yellow envelope marked "Personal and Confidential."  He worked on his complaint, entering and leaving the building at will.

But, after several hours, Whitfield and Detective Danielle Tolliver of the Philadelphia Police told McCann that he was being "disruptive"; that "[SDP] could no longer accommodate him"; and that he was making "the employees uncomfortable."  They ordered him to finish up his complaint and leave, but when he requested more time to complete his complaint, he was allowed to stay.  He tried to visit the Charter School Office and Parent Resource Center, but was told he could only finish his complaint in the building's lobby.  Eventually, after time wore on, Whitfield and Tolliver told him once again that he needed to leave.

McCann refused this order, claiming it was unlawful.  More police arrived, and McCann was escorted from the building in handcuffs.  During the course of this process, SDP staff told at least one responding officer that McCann "had some mental health issues and required help." His wife, who had also arrived on the scene, told responding officers that her husband "ha[s] Bipolar Disorder." Once outside the building, police uncuffed McCann, telling him he was free to go. McCann pushed back, stating that he either needed to be re-cuffed or he was going back inside. After some back and forth, McCann was dropped off at Thomas Jefferson University Hospital, where he was shortly thereafter picked up by his wife.

After this incident, David Werner—SDP's Director of Call Center Operations for the Office of Family & Community Engagement—requested that McCann "no longer be admitted to the Welcome Center, and would prefer if [he] were not admitted to the building without a bona fide meeting that can be verified before he is admitted."  Another SDP official added Johnson to

9

the conversation "to ensure we can ban McCann from the building moving forward."  As SDP's then-Interim Chief of School Safety, Johnson granted this request, replying that "Mr. McCann has been excluded from the Education Center, unless he has an approved appointment with a Program Office which can be verified."

On November 7, 2024, McCann visited Central Offices, speaking at a School Board meeting without any issues.  However, he alleges that—one week later—when he visited Central Offices seeking to submit his charter school application, school safety officers prevented him from traveling beyond the Central Offices' lobby.[4]

## III.    LEGAL STANDARDS

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Id.* at 256 (citing *Celotex*, 477 U.S. at 322-26).  However, the non-movant is "entitled to all reasonable inferences from the underlying facts in the light most favorable to the non-moving party."

---

[4] Parallel to these events, McCann submitted an application to succeed Beaver as GAMP's next principal.  The District acknowledged receipt of his materials.  But, the record contains no evidence as to whether it has yet made a decision.

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993).

The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Loc. 825, Int'l Union of Operating Eng'rs, AFL-CIO,* 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982). It is not enough to discredit the moving party's evidence, the nonmoving party is required to "present *affirmative* evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *See Anderson,* 477 U.S. at 249-50. Also, if the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex,* 477 U.S. at 323.

IV.    ANALYSIS

E.  McCann's HIPAA, Whistleblower, RTKL, and Sunshine Act Claims

Turning to McCann's claims: There is no private right of action under HIPAA and, thus, summary judgment must be granted on this claim. *See, e.g.*, *Byrne v. Berks Cnty. Jail*, 2024 WL 2794446 (3d Cir. May 31, 2024) (citing *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021)) ("The District Court correctly concluded that HIPAA does not provide a private right of action.")[5]

Summary judgment is also warranted on McCann's Whistleblower, Right to Know Law,

---

[5] *See also Miller v. Nichols*, 586 F.3d 53, 59-60 (1st Cir. 2009); *Meadows v. United Servs., Inc.*, 963 F.3d 240, 244 (2d Cir. 2020); *Acara v. Banks*, 470 F.3d 569 (5th Cir. 2006); *Faber v. Ciox Health, LLC*, 944 F.3d 593, 596-97 (6th Cir. 2019); *Stewart v. Parkview Hosp.*, 940 F.3d 1013, 1015 (7th Cir. 2019); *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010); *Webb v. Smart Document Sols., LLC*, 499 F.3d 1078, 1081 (9th Cir. 2007); *Mayfield v. Presbyterian Hosp. Admin.*, 772 F. App'x 680, 686 (10th Cir. 2019); *Laster v. CareConnect Health Inc.*, 852 F. App'x 476, 477 (11th Cir. 2021).

and Sunshine Act claims.

Pennsylvania's Whistleblower Act extends its protections only to "employees" who report actual wrongdoing by their public agency employer. 43 Pa. C.S. § 1423; *Javitz v. Luzerne Cnty.*, 293 A.3d 570, 573, 579 (Pa. 2023). An employee is "[a] person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for an employer." 43 Pa. C.S. § 1422. Former employees are also protected if they made their report while still an employee. *Javitz*, 293 A.3d at 573, 580. Here, McCann readily admits that he does not fit that definition. He expressly concedes that he "is not currently employed by the School District of Philadelphia or the other named Defendants[,]" and has not been since, at least, 2020. Furthermore, his alleged whistleblowing occurred *after* he left the employ of the District. Accordingly, he cannot proceed on this claim. *See Javitz*, 293 A.3d at 573, 580.

Turning next to McCann's claims under Pennsylvania's Right to Know Law which applies when a formal written request for records is made to an agency employee (with oral requests being acceptable at the discretion of the agency). 65 Pa. C.S. § 67.702-703. Not every request for information or records is such a request, only those requests which are clearly addressed to an organization's open records officer. *Com. v. Off. of Open Recs.*, 103 A.3d 1276, 1287 (Pa. 2014). There is nothing in the record to indicate that McCann submitted any such requests. Indeed, he readily admitted as much during his deposition: when asked if he submitted a Right to Know request to SDP, he flatly responded "No." Thus, without submission of any procedurally compliant requests, McCann did not properly invoke the act's procedures, and accordingly cannot proceed with this claim. *See id.*; 65 Pa. C.S. § 67.702.

Likewise, summary judgment must be granted on his Pennsylvania Sunshine Act claim. The Sunshine Act requires agencies to deliberate and conduct "official action" on "agency

12

business" in open and public meetings.  65 Pa. C.S. §§ 702-704.  Official action "includes, *inter alia*, decisions concerning an agency's business . . . and specifically includes decisions . . . that commit [the agency] to a particular course of conduct."  *Preston v. Saucon Valley Sch. Dist.*, 666 A.2d 1120, 1123 (Pa. Commw. 1995).  However, public meetings are not required regarding "administrative action," wherein the agency is simply executing policies: (1) previously authorized; or, (2) required by "official action" adopted in a prior open meeting.  65 Pa. C.S. § 703; *see also, e.g. Silver v. Borough of Wilkinsburg*, 58 A.3d 125, 128-29 (Pa. Commw. 2012) (defining administrative action as the execution of policies previously authorized by official action, and ruling that termination of an employee was an official decision, but the issuance of a termination letter was administrative action).

Here, McCann argues that SDP unlawfully: (1) barred him from SDP facilities; (2) made decisions regarding his charter application; and, (3) made decisions regarding his applications for principalship in non-public meetings, thereby violating the law.  Summary judgment is appropriate for two reasons.  First, McCann's exclusion from SDP facilities was not predicated on official action, but rather administrative action.  Under District Policies 904 and 907, the superintendent and certain other officials are permitted to exclude persons from entering SDP facilities without an appointment or prior authorization.[6]  Acting through these pre-existing procedures is administrative action.  *See Silver*, 58 A.3d at 128-29.  Therefore, excluding

---

[6] *See* Philadelphia School District Policy 904 ("Disruption: Any behavior or conduct by an individual . . . that interferes with the normal operation of a District or school-sponsored event, activity, or process, including, but not limited to: . . . (7) Entering any portion of the school premises without authorization . . .  The Board authorizes the Superintendent or their designee to prohibit the entry of or remove any individual from a school event whose conduct constitutes a disruption[.]"); *see also* Philadelphia School District Policy 907 ("Persons wishing to visit a school shall make arrangements in advance with the school office in that building by stating the reason, date, and time of the proposed visit. In all cases where permission is not obtained in advance it must be obtained promptly upon entering the school. Failure to obtain consent within fifteen (15) minutes after entering district facilities shall be considered presumptive evidence of violation of Board policy and City ordinance.  The building principal or designee has the authority to prohibit the entry of any individual to a district school who violates Board policy or administrative procedures.")

McCann from SDP facilities did not require a public meeting or constitute official action.

Second, the record does not show that any meetings or official action occurred with regard to McCann's applications. There are no facts on the record indicating that a meeting took place to make a final decision regarding GAMP's principal, or that McCann's application for the job was ever rejected by the District. The same is true of McCann's charter application: the record shows that he withdrew his application before SDP made any decision on its merits, or held any meeting to make that determination. Because SDP never "commit[ted itself] to a particular course of conduct" on these applications, it never took official action requiring a public meeting. *See Preston*, 666 A.2d at 1123. In sum, the record does not support that SDP violated the Sunshine Act by conducting any official action or holding any non-public meetings.

Defendants' Motion shall therefore be granted regarding McCann's HIPAA, Pennsylvania Whistleblower, Right to Know, and Sunshine Act claims. His remaining claims for unlawful discrimination in violation of the ADA, for defamation, and for a Section 1983 violation premised on First Amendment retaliation are addressed in more fulsome detail below.

### F. McCann's ADA Claim

Turning to McCann's ADA claim: He alleges that the SDP discriminated against him by excluding him from SDP facilities based on his mental health condition, and by failing to provide reasonable accommodations for the same. In its Motion, the SDP argues that McCann cannot meet his burden, as he was never actually banned from those locations and never requested accommodations.

#### i.   *Discrimination*

##### a.   *Individual Defendants' Liability Under the ADA*

As a threshold matter, individuals cannot be sued under Title II of the ADA. *Emerson v.*

14

*Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) ("[I]ndividuals are not liable under Titles I and II

of the ADA, which prohibit discrimination by employers and public entities, respectively.");

*Kokinda v. Pennsylvania Dep't of Corr.*, 779 F. App'x 938 (3d Cir. 2019) (per curiam)

("Kokinda's claims for individual damages liability under Title II of the ADA fail for the simple

reason there is no such liability.")  Thus, summary judgment must be granted with respect to

McCann's ADA claims against each of the individual defendants.

### b. *Liability of the School District under the ADA*

Whether his Title II ADA discrimination claim is viable against the District turns on

whether the evidence supports that McCann (1) has an ADA-recognized disability; (2) was

excluded from participation in, or the benefits of, services, programs, or activities provided by

the SDP; and, (3) that the exclusion was predicated on his disability.  *Disability Rts. New Jersey,*

*Inc. v. Comm'r New Jersey Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015).  Causation is

"but-for" causation, *i.e.* the disability "played a role in the decisionmaking process and had a

determinative effect on the outcome of that process." *CG v. Pennsylvania Dep't of Educ.*, 734

F.3d 229, 236 n.11 (3d Cir. 2013) (cleaned up).

SDP does not contest that McCann has an eligible disability—bipolar disorder—and that

it knew of this disability.  Furthermore, the record supports that he was excluded from SDP's

services and programming.  By way of illustration, when he visited GAMP to raise concerns and

acquire records, he was prevented from entering, reportedly at Beaver's personal order, and the

Philadelphia police were called to remove him from the premises.  Similarly, he was escorted by

Philadelphia police out of SDP's Central Offices on October 18.  Thereafter, internal emails

show that Johnson and other district officials decided to "ban" or "exclude" him from Central

Offices.  Then, on November 15, 2024, he was prevented from entering the District's Charter

15

School Office to turn in his charter application, being required to wait in the building's lobby until a Charter Office representative came to retrieve his materials. Such conduct can constitute an exclusion from SDP's services and programming under the ADA. *See Disability Rights*, 796 F.3d at 301; *Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd sub nom. Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) (the "services, programs, or activities" language of the ADA is extremely capacious "and includes anything a public entity does.")

The only remaining question on this claim is thus whether his exclusions were predicated on his disability. The District argues that it was his disruptive behavior, not his disability, that led it to exclude him, specifically: (1) his attempts to hold unscheduled meetings with District personnel; (2) his frequent visits to both facilities; (3) his "bother[ing] of staff with things they ha[d] no capacity to assist him with"; and, (4) his refusal to leave when asked. But McCann points to other evidence that raises a genuine issue of fact. Again by way of illustration, when Philadelphia police arrived at GAMP on October 16th, they repeatedly inquired as to his mental health status. Similarly, when police arrived at Central Offices on October 18th, an unidentified District employee told one of the officers that "a white male had mental health issues and required help." Each episode bears on the District's understanding of McCann's disability and raises a genuine issue of material fact regarding whether its actions were predicated on its perception of his bipolar disorder, or his conduct. *See CG*, 734 F.3d at 236 n.11; *Petruzzi's*, 998 F.2d at 1230; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movants should be taken as true.") Such a disputed issue of material fact must go to the jury. Accordingly, summary

judgment will not be granted on McCann's ADA discrimination claim against the District.

### ii.    Failure to Accommodate

For McCann's failure to accommodate theory, summary judgment is warranted in favor of the District.  Under Title II, the failure of a public entity to provide disabled persons with reasonable accommodations constitutes discrimination within the meaning of the ADA.  *See Furgess v. Pennsylvania Dep't of Corr.*, 933 F.3d 285, 287 (3d Cir. 2019) ("[T]he ADA require[s] public entities . . . to provide, in all of their programs, services, and activities, a reasonable accommodation to individuals with disabilities."); *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 117-18 (3d Cir. 2018) ("An essential feature of [the ADA's] prohibition against discrimination is, of course, the duty to make reasonable accommodations and reasonable modifications[.]" (internal quotations omitted)).  The duty to provide accommodations is triggered when the requestor provides notice of both their "disability and their desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

Here, the record does not support that McCann ever requested an accommodation.  Indeed, in his Responses to Defendants' Interrogatories, he admits "he never submitted a formal written accommodations request," while in his deposition, he testified that he never requested an accommodation.  Although his newly filed affidavit characterizes his October 18th request for additional time as a request for accommodations, those statements are not capable of sustaining a genuine issue of material fact given his interrogatory response and deposition testimony.  *See Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists.")

Therefore, with no requests for accommodation on the record, McCann cannot pursue his ADA claim against the District under a failure to accommodate theory.  *See id.*

### G.  McCann's First Amendment Retaliation Claim

Turning now to McCann's First Amendment retaliation claim,[7] while he brings this action against all Defendants, he does not offer any facts or argument that Ferriola was involved in the alleged retaliation.  Therefore, summary judgment is appropriate for the claim against her.

Turning next to his claim against SDP, when pursuing a Section 1983 claim against a municipal agency, plaintiffs must satisfy the requirements of *Monell v. Dep't of Soc. Servs. of the City of New York*, namely that: (1) the alleged constitutional violation resulted from the "policy or custom" of the agency; (2) the municipal agency acted deliberately and was the moving force behind the violation; and, (3) the plaintiff's injury was caused by the identified policy or custom. 436 U.S. 658, 690-92 (1978).  Here, McCann's Complaint does not allege that he is proceeding under the *Monell* framework and, thus, his First Amendment retaliation claim against the District is not properly part of this action.

Turning then to the remaining Defendants, Beaver and Johnson: As a preliminary matter, his First Amendment retaliation claim is made against them in their personal, rather than their official, capacities.  When local government units are parties to a suit, their employees are not necessary parties, as the local government units can be sued directly for damages, injunctive relief, or declaratory relief.  *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).  That is

---

[7] Two quick notes: First, although in setting forth his First Amendment claims McCann does not specifically cite to 42 U.S.C. § 1983 as a vehicle for his claims, the Parties' briefing assumes this to be the case. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam) (there is "no heightened pleading rule requir[ing] plaintiffs to invoke [Section] 1983 expressly in order to state a claim."). Second, while McCann did not respond to Defendants' arguments regarding his retaliation claim, they must still demonstrate that they are entitled to summary judgment in their own right; his silence does not license summary judgment. *See Anchorage Assocs. v. Virgin Islands Bd. Of Tax Rev.*, 922 F.2d 168, 174-75 (3d Cir. 1990).

because a suit against a government employee in their official capacity is duplicative of a suit against their employer. *See id*.; *see also Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp.2d 423, 432 (E.D. Pa. 1998) ("By bringing official capacity suits against [three individual defendants], and against the Borough itself, the Plaintiff has essentially named the Borough as a defendant four times.") In contrast, personal capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).[8] Here, Beaver and Johnson were employed by the District. Because suing them in their official capacity would be duplicative of suing SDP, *see Kentucky v. Graham*, 473 U.S. at 167, n.14, his claims against them are in their personal capacities.

To pursue a personal capacity claim under Section 1983, a plaintiff must show that a government official "acting under color of state law, caused the deprivation of a federal right." *Hafer*, 502 U.S. at 25. A public employee "acts under color of state law while acting in [their] official capacity or while exercising [their] responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). In other words, they exercised power "possessed by virtue of state law and made possible only because [they were] clothed with the authority of state law." *Id.* at 49. For a First Amendment retaliation claim, a plaintiff must also show that: (1) the plaintiff engaged in a protected speech activity; (2) defendants engaged in a retaliatory action sufficient to deter a person of ordinary firmness from exercising their First Amendment rights; and, (3) a causal connection exists between the protected speech and retaliatory action. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

---

[8] Plaintiffs may bring claims against government officers in their personal capacity *and* their employing agency in the same suit. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 794-96 (3d Cir. 2000) (remanding a First Amendment retaliation claim against a school official and school district due to lingering disputes of material fact).

Here, the Parties agree (or at least the Defendants do not contest) that Beaver and Johnson were District employees acting under color of state law during all relevant conduct. Similarly, Defendants do not contest that McCann's filing of complaints constitutes protected speech. *See Brennan v. Norton*, 350 F.3d 399, 417 (3d Cir. 2003) (overruled on other grounds) (holding that formal complaints are protected speech); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 279-85 (3d Cir. 2004) (holding that official complaints are protected speech, even if they involve private grievances). Furthermore, the record supports multiple instances of conduct capable of constituting adverse, retaliatory action: (1) McCann was barred from entering GAMP, allegedly at Beaver's personal order as principal; (2) police were called by unknown GAMP personnel to remove him from that campus; and, (3) Johnson, as interim Chief of School Safety, instituted a "ban" or "exclusion" of McCann from Central Offices, including when McCann attempted to submit his charter application. *See Mirabella v. Villard*, 853 F.3d 641, 650-51 (3d Cir. 2017) (finding that a targeted restriction of plaintiff's access to local government constituted retaliatory action).

Defendants next argue that there is no evidence of a causal connection between McCann's protected speech and the alleged retaliation against him, as his exclusion from District facilities was based on his "disruptive" behavior, not because of his speech.

To show causation, plaintiffs "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W.*, 480 F.3d at 267. A close temporal proximity between protected activity and retaliation can demonstrate causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997).

20

Here McCann has presented evidence that he was ousted from GAMP in the middle of filing a complaint. At GAMP, a school safety officer prevented him from entering a District building to report allegedly unsafe dismissal procedures, allegedly on Beaver's personal order. Thereafter, someone at GAMP called the Philadelphia police, who instructed McCann to leave the premises, ultimately preventing him from filing his complaint. *See Brennan*, 350 F.3d at 417 (holding that formal complaints are protected speech); *Eichenlaub*, 385 F.3d at 279-85 (holding that official complaints are protected speech, even if they involve private grievances); *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (holding that plaintiffs may use Section 1983 to challenge adverse actions taken to *prevent* protected speech). A reasonable jury could find that such close temporal proximity between protected speech and allegedly retaliatory action indicates "causal connection" between the two. *Lauren W.* at 267; *see also Krouse*, 126 F.3d at 503-04; *Woodson*, 109 F.3d at 920-21.

Furthermore, two days later, District personnel and Philadelphia police removed McCann from Central Offices while he was drafting a complaint about his treatment by Beaver and other District officials. Within two weeks, Johnson formally "excluded" McCann from Central Offices. Such a timespan is capable of demonstrating causation. *See, e.g., Yu v. Dept. of Veterans Affairs*, 528 Fed. App'x 181, 185 (3d Cir. 2013) ("Temporal proximity can reveal . . . retaliation was for [protected speech] if the proximity is unusually suggestive-meaning within a few days but no longer than a month." (internal quotations omitted)); *Hammond v. City of Wilkes Barre*, 628 Fed. App'x 806, 808 (3d Cir. 2015) (noting that "two weeks may be close enough temporally to be probative of causation.")

However, even if a plaintiff establishes causation, a defendant can still "defeat the claim . . . by showing [by a preponderance of the evidence] that it would have taken the same action

21

even if plaintiff had not engaged in protected speech." *Lauren W.*, 480 F.3d at 267 (citing *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002)).  Here, Defendants again argue that McCann's disruptive conduct is the root of his exclusion from GAMP and Central Offices, not animus for his protected speech.  They point to his "showing up to schools and/or School District offices without any appointments or notice" as an unreasonable imposition on its personnel, and the true reason McCann was excluded from District facilities.

But there is a disputed issue of material fact as to whether McCann's conduct was disruptive.  While Defendants place great weight on the "disruption" occasioned by McCann's visits to GAMP and SDP's Central Office, the record contains no detail to put meat on the bones of that characterization with respect to how he was disruptive.  Internal SDP communications, note that McCann was "bothering" staff with "things they have no capacity to assist him with" and attempting to have unscheduled meetings with employees in the Charter Office and other divisions of the SDP.  Upon hearing such evidence, a reasonable jury could determine he was disruptive.  But, then again, the jury could also conclude from the fact that he at times moved freely through Central Offices talking to staff about his various charter application-related inquiries, and coming in and out of the building for smoke breaks and to take phone calls, as evidence to support a conclusion that he was not disruptive.

This contradictory evidence highlights that there is a dispute of material fact on the question of causation for McCann's First Amendment retaliation claim.  *See Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 276-77 (3d Cir. 2007) (holding that summary judgment was inappropriate where the parties' evidence contradicted one another, and a reasonable juror could conclude that retaliatory conduct was predicated on protected speech).  Whether McCann was excluded based on his protected speech or his conduct requires crediting one Party's

22

evidence over another's, a task properly delegated to a jury. *See Davis v. Portline Transportes Mar. Internacional*, 16 F.3d 532, 536 n.3 (3d Cir. 1994). Therefore, Beaver and Johnson's Motion shall be denied with respect to this claim.

### H. Defamation

While McCann's final claim, defamation, is lodged against all Defendants, he does not identify any allegedly defamatory statements made by Beaver or Johnson. Accordingly, summary judgment is appropriate on the defamation claim against them. *See Doe*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).

Turning then to the remaining Defendants, the District and Ferriola, McCann alleges they defamed him by telling McCann's ex-wife, Joanna DeMarco, and unnamed "others" that he had "impersonated" a crossing guard. These Defendants argue that the defamation claim against them should be dismissed because: (1) the Political Subdivision Tort Claims Act (PSTCA), 42 Pa. C.S. § 8541 *et seq*., protects the District and its employees from liability; (2) McCann has failed to properly allege a defamation claim; and, (3) truth is an absolute defense against defamation.

### i. *SDP is Immune Under the Pennsylvania Political Subdivision Tort Claims Act*

The PSTCA immunizes local agencies for "damages on account of an injury to a person or property within the limits set forth [in the PSTCA]." 42 Pa. C.S. § 8542(a). To remove an agency's immunity, a plaintiff must show: (1) there exists a common law or statutory right of action against non-agencies for similar conduct; (2) the plaintiff's injury was caused by the agency's negligent acts, or those of its employees; and, (3) that its actions fell into one of nine

23

enumerated exceptions, none of which are present here.[9]  *See* 42 Pa. C.S. § 8541(a), (b).  If a claim does not satisfy all three of these requirements, it fails as a matter of law.

Here, McCann does not allege any negligent acts tied to his defamation claim by the District or its employees, and his claim does not fall into any of the nine enumerated categories for liability.  *See* 42 Pa. C.S. § 8542(b).  Therefore, the District is immune from suit with respect to McCann's defamation claim and its summary judgment Motion shall be granted on that claim.

### ii.    *A Dispute of Material Fact Exists Regarding Ferriola's Immunity*

Ferriola argues that as a District employee, she is also immune from liability under Sections 8542 and 8546 of the PSTCA.  McCann maintains that she is not, as the statement was made "outside the scope of her professional duties" as a special education instructor.

He is right that, ordinarily, this would place her beyond the PSTCA's protection.  *See* 42 Pa. C.S. § 8542 (immunizing local agencies and their employees for actions taken *within* the scope of their office or duties.).  However, he does not offer any facts regarding whether the statement was made within or outside the scope of her duties, thus the argument does not resolve the issue.  *See Versarge v. Twp. of Clinton, N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993) ("Legal memoranda and [] argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." (quoting *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985))).  Given that, Ferriola is by default immune under the PSTCA in that employees of local agencies have official immunity against claims "arising from, or reasonably related to, the office or the performance of the[ir] duties,"  42

---

[9] The categories are: (1) operation of a motor vehicle; (2) care, custody or control of personal property; (3) care, custody, or control of real property; (4) dangerous conditions related to trees, traffic controls, or street lighting; (5) dangerous conditions relating to utility service facilities; (6) dangerous conditions of streets; (7) dangerous conditions of sidewalks; (8) care, custody, or control of animals; and, (9) sexual abuse.

Pa. C.S. § 8546, and employees acting within the scope of their duties are liable "only to the same extent as [their] employing agency." *Kuzel v. Krause*, 658 A.2d 856, 858 n.3 (Pa. Commw. 1995).

McCann fights back by arguing that Ferriola's statement constitutes willful misconduct, thereby removing her immunity under Section 8550 of the PSTCA, which provides that an employee's immunity is lost if "it is judicially determined that the [at-issue] act of the employee constituted . . . willful misconduct[.]" 42 Pa. C.S. § 8550.[10]  The record does not contain sufficient information to make that determination in that Ferriola categorically denies that she stated to anyone that McCann impersonated a crossing guard; whether or not Ferriola made the alleged statement is a question for the jury.  Without that finding, and absent facts in the record, whether Ferriola's alleged statements constituted willful misconduct cannot yet be answered. *See Davis,* 16 F.3d at 536 n.3; *Petruzzi's*, 998 F.2d at 1230.  Therefore, her Motion shall be denied on this ground.

### iii.    *The Statement is Capable of Defamatory Meaning*

In defamation cases, courts are to make a threshold determination as to whether an alleged statement is capable of defamatory meaning.  *See Kurowski v. Burroughs*, 994 A.2d 611, 616-17 (Pa. Super. 2010) ("It is the function of the trial court to determine, in the first instance, whether the communication complained of is capable of defamatory meaning[.]").  Ferriola argues that—even if she had made the statement of which McCann complains (which she states that she did not)—McCann has not shown that the statement is capable of defamatory meaning.

When considering whether a statement is capable of defamatory meaning, the question is

---

[10] For PSTCA purposes, "willful misconduct" is synonymous with "intentional tort."  *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006).  The party attempting to overcome PSTCA immunity has the burden of demonstrating willful misconduct.  *See Pettit v. Namie*, 931 A.2d 790, 799 (Pa. Commw. 2007).

whether the statement tends to harm the reputation of another "as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013) (citing *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 124 (Pa. 2004)). A statement is defamatory *per se* where it "imputes to another conduct, characteristics, or a condition that would adversely affect [them] in [their] lawful business or trade." *Walker v. Grand Cent. Sanitation, Inc.*, 634 A.2d 237, 241 (Pa. Super. 1993); *see also Geyer v. Steinbronn*, 506 A.2d 901, 909 (Pa. Super. 1986). Historically this has included statements imputing crimes, and "shortcomings affecting the plaintiff in his business, trade, profession, or calling[.]" *Agriss v. Roadway Exp., Inc.*, 483 A.2d 456, 470 (Pa. Super. 1984). Impersonation of a crossing guard is a crime under Pennsylvania law. *See* 18 Pa. C.S. § 4912 ("A person commits a misdemeanor . . . if he falsely pretends to hold a position in the public service with intent to induce another to submit to such pretended official authority or otherwise to act in reliance upon that pretense[.]"); *accord* 11 Pa. C.S. § 12010(a) (empowering city councils to appoint and dismiss school crossing guards). Since the alleged statement imputed a crime to McCann—impersonation of a public official—it is capable of being *per se* defamatory. *See Agriss*, 483 A.2d at 470.

### iv.    *McCann Has Met His Burden for All Elements Except Publication*

Since the statement is capable of being *per se* defamatory, the inquiry shifts to whether McCann has sufficiently supported the other elements of his claim.

Under Pennsylvania law, the elements of defamation as applicable here are:

> (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication.

*Alston v. PW-Philadelphia Wkly.*, 980 A.2d 215, 220 (Pa. Commw. 2009) (citing 42 Pa. C.S. § 8342 *et seq.*).  Ferriola argues McCann has not sufficiently demonstrated that: (1) he suffered special harm, *i.e.* monetary or pecuniary injury; (2) he suffered actual harm; and, (3) Ferriola published the alleged statement.

Turning first to special harms, because the statement is capable of being *per se* defamatory, McCann is not required to show special harms.  *See Brinich v. Jencka*, 757 A.2d 388, 397 (Pa. Super. 2000) ("When a communication constitutes slander *per se*, a plaintiff is not required to prove special harm, *i.e.* pecuniary loss."); *Agriss*, 483 A.2d at 470 (holding that libelous statements are always *per se* defamatory and thus do not require proof of economic losses).  Therefore, Defendants' first argument is unpersuasive.

Looking next at actual harms, McCann must show that he suffered "impairment of reputation and standing in the community, personal humiliation, and mental anguish [or] suffering." *Agriss*, 483 A.2d at 467.  He has done so.  The record shows that, following October 16th, he heard rumors that he had triggered a lockdown by impersonating a crossing guard.  He was also contacted directly by concerned friends and supporters of his charter efforts, who wanted to know what happened.  Allegedly, the rumors also harmed McCann's relationship with DeMarco, who used the incident to deny McCann scheduled visits with their son.  On this evidence, a reasonable jury could find that the alleged statement caused harm to McCann's reputation, satisfying actual harm.

      a. <u>A Dispute of Material Fact Remains Regarding Publication</u>

Turning finally to publication, Ferriola argues that there is no evidence that she made the alleged statements to DeMarco or anyone else, and therefore McCann cannot meet his burden.

The record shows both sides have evidence supporting their position.  According to

McCann, on October 17, 2024, McCann's wife, Jillian Macomber, received a call from DeMarco, who stated, "someone at GAMP [told her] that [McCann] was impersonating a crossing guard."  When McCann spoke with DeMarco personally, she told him that "Stephanie Ferriola, a special education teacher at GAMP . . . [told her] that the school had been locked down because [he] was impersonating a crossing guard."

Ferriola's account differs.  According to her responses to McCann's Interrogatories, she did not speak with DeMarco, did not discuss McCann's mental health, and only "mentioned to [Ferriola's] sister that Plaintiff was at GAMP — that was the extent of the statements that Ms. Ferriola made about Plaintiff."

With evidence on both sides, Ferriola's alleged publication remains an issue for the jury, rendering summary judgment inappropriate on this ground.  S*ee Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ("At the summary judgment stage of proceedings, courts do not weigh the evidence or make credibility determinations, but, instead leave that task to the fact-finder at a later trial.").  Therefore, Ferriola's Motion shall be denied on this ground.

### v.      It is Unclear Whether the Alleged Statement is True

Finally, Ferriola asserts that the alleged statement is true, and therefore cannot be defamatory.

Truth of statement is an absolute defense to defamation claims.  42 Pa. C.S. § 8343(b). When a plaintiff succeeds in meeting the elements of defamation, a defendant may avoid liability by showing the substantial truth of the statements.  *Graboff v. Colleran Firm,* 744 F.3d 128, 136 (3d Cir. 2014).    The truth defense must go toward the "gist" or "sting" of the defamatory statement.  *Dunlap v. Philadelphia Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. Super. 1982).

Here, while the legal dispute is whether Ferriola's statements were true or false, the core

28

of the disagreement is determining whether McCann impersonated a crossing guard on October 16th, or not.  Ferriola argues that McCann was indeed impersonating a crossing guard, as evidenced by his statement that "I explained [to GAMP personnel] . . . I was [there] to help with crossing guard duties and I would be on the corner."  Defendants further allege (and McCann does not dispute) that he was never authorized to act as an official or volunteer crossing guard.

McCann has a different interpretation of events.  In his deposition, McCann states that, in an effort to correct perceived shortcomings in GAMP's dismissal procedures, he visited GAMP on October 16th to donate "a stop sign and a light blue neon — neon yellow covering."  He also "assisted parents, students, and drivers at dismissal to ensure safe crossings . . . [but] was not wearing anything resembling a crossing guard uniform."

From this ambiguous and contradictory evidence, it is not clear whether McCann was "impersonating" a crossing guard.  With such a factual dispute still live, summary judgment on McCann's defamation claim would be premature.  *See Meyers v. Certified Guar. Co., LLC*, 221 A.3d 662, 672-73 (Pa. Super. 2019) (reversing summary judgment where it was ultimately unclear whether the at-issue statements were true or false, and "a jury should [have] resolve[d] that genuine question of fact.")

Altogether, Defendants' Motion will be granted with respect to the defamation claim against the District, Beaver, and Johnson Jr., but denied with respect to the claim against Ferriola.

An appropriate Order follows.

BY THE COURT:

S/ WENDY BEETLESTONE

_____

**WENDY BEETLESTONE, C.J.**

29